UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

---------------------------------------------------------------X

JONATHAN NEIRA,

             Plaintiff,

        -against-

COUNTY OF NASSAU, NASSAU COUNTY
SHERIFF'S DEPARTMENT, NASSAU
COUNTY CORRECTIONS CENTER,
MICHAEL J. SPOSATO, individually,
and as Sheriff of Nassau County,
JOHN DOES #1-10, representing Nassau County
Corrections Officers in their individual and official
Capacities, whose names are currently unknown to
the Plaintiff but are known to the Defendants,
ARMOR CORRECTIONAL HEALTH SERVICES,
INC., ARMOR CORRECTIONAL HEALTH
SERVICES OF NEW YORK, INC., and
JOHN AND JANE DOES #11-20, representing
Armor Correctional Health Services Employees and
Agents in their individual and official capacities,
whose names are currently unknown to the Plaintiff
but are known to the Defendants,

             Defendants.

**MEMORANDUM AND ORDER**
13-CV-07271 (JMA) (AYS)

**FILED**
**CLERK**

4:06 pm, Sep 29, 2022

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

---------------------------------------------------------------X

**APPEARANCES:**

David Antwork
1757 Merrick Avenue, Suite 205
Merrick, New York 11566
      *Attorney for Plaintiff*

Callan Wright Tauster
Liora M. Ben-Sorek
Nassau County Attorney's Office
1 West Street
Mineola, New York 11501
      *Attorneys for Defendants County of Nassau, Nassau County Sheriff's Department,*
      *Nassau County Corrections Center and Michael J. Sposato*

**AZRACK, United States District Judge:**

Plaintiff Jonathan Neira ("plaintiff") brings this civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983") against defendants the County of Nassau (the "County"), Nassau County Sheriff's Department (the "NCSD"), Nassau County Corrections Center (the "NCCC"), Sheriff Michael J. Sposato ("Sheriff Sposato") (collectively the "County defendants"), and John Does #1-10 ("John Does"), representing Nassau County Corrections Officers. The Second Amended Complaint alleges violations of the Eighth and Fourteenth Amendments of the United States Constitution and various state-law claims.

Currently pending before the Court is the County defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, the Court grants the defendants' motion for summary judgment on the federal claims and dismisses all of plaintiff's federal claims. Having disposed of the federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Accordingly, plaintiff's Second Amended Complaint is dismissed in its entirety.

## I. BACKGROUND

### A. Factual Background

In 2011, plaintiff was shot in the back of the head by an individual named Rochelle Davis ("Davis") and suffered a traumatic brain injury leaving him with cortical blindness and a seizure disorder. (Plaintiff's Rule 56.1 Statement ("Pl. 56.1") ¶¶ 1, 5, 39, 89, ECF No. 134.) As a result of the shooting, plaintiff has bullet fragments in the back of his brain and has been declared legally blind.[1] (Id. ¶¶ 1, 39.)

---

[1] Defendants dispute that plaintiff is legally blind. (Defs. Mot. at 12.)

On August 18, 2013, plaintiff was arrested for possession, and was remanded to the NCCC on August 20, 2013.[2]  (Declaration of Callan W. Tauster ("Tauster Decl."), Plaintiff's Deposition, Nov. 15, 2019 ("Pl. Dep.") 24:21-25:26:7; 26:24-27:6, Ex. A, ECF No. 133-5, Pl. 56.1 ¶ 91.)  At the time of his admittance to the NCCC, plaintiff was withdrawing from drugs.  (Defendants' Rule 56.1 Statement ("Defs. 56.1") ¶ 17, ECF No. 133-2.)  Prior to his incarceration, plaintiff had been using prescribed oxycodone and snorting heroin.  (Pl. Dep. 127–28.)

Following his arrest, but prior to his admission to the NCCC, plaintiff was strip searched at Hempstead District Court where illegal substances were found on his person.  (Tauster Decl., Disciplinary Report, Aug. 20, 2013, ("Def. Ex. C"), ECF No. 133-7; Pl. Dep. 56:5-17.)  As a result, plaintiff received ninety-days lock-in and loss of commissary for three weeks.[3]  (Defs. Ex. C; Defs. 56.1 ¶ 74.)

Upon being admitted to the NCCC on August 20, 2013, plaintiff received an initial medical evaluation that same day.  At all relevant times during plaintiff's incarceration, Armor Correctional Health Services of New York, Inc. ("Armor") was the provider of medical care at the NCCC pursuant to its contract with the County.  (Pl. 56.1 ¶ 37.)

Plaintiff's commitment papers indicate "MED. ATTN. AS NEEDED," note his legal blindness and seizure disorder, and state that he is to have "no contact with Davis, Rochelle," who was also incarcerated at the NCCC awaiting trial on charges related to shooting plaintiff.  (Id. ¶¶ 93, 94, 103; Declaration of David A. Antwork ("Antwork Decl."), Plaintiff's Commitment Form, ("Pl. Ex. B"),  ECF No. 134-2.)

---

[2] The NCCC is a correctional facility operated by the NCSD, an agency of Nassau County.

[3] Plaintiff claims that he was ultimately subjected to six months of lock-in.  However, none of his claims concern this lock-in.

## 1.  The Assault

Shortly after plaintiff's initial medical evaluation on August 20, plaintiff was assaulted by three unidentified correction officers in the hallway while he was being escorted to his housing unit.  (Pl. 56.1 ¶ 11; Defs. 56.1 ¶ 80; Pl. Dep. 61:9-18.)  Plaintiff claims that he had asked one of the "approximately 5 [correction officers] present" to walk in front of him because he could not see well.  (Pl. 56.1 ¶ 11.)   In response, "[t]he officer growled, kicked him from the back and punched him on the right side of his head, causing him to stumble forward to the ground."  (Id.) The officer called him "a piece of shit, tough guy, MS-13," and two or three more correction officers joined in "kicking plaintiff all over his body, including his head, arms, and legs while he was on the ground."  (Id.)  According to plaintiff, one of the officers then grabbed both of his shoulders from behind, walked him to his unit and slammed the right side of his head into the gate before throwing him in his cell.  (Id.)

Plaintiff was unable to identify the correction officers who assaulted him because of his blindness.  (Id. ¶ 13.)  While plaintiff testified, at his deposition, that an "elder gentleman" in his housing area witnessed the assault, plaintiff could not identify this alleged witness other than to say that he was of Dominican decent and possibly named Domingas.  (Id. ¶ 15.)  Plaintiff believes the witness resides on Bellmore Avenue in East Meadow, New York.[4]  (Id.)  Plaintiff testified that, at the time of the assault, he was sedated because of his heroin use.  (Pl. Dep. 68:2-69:5.)

## 2.  Plaintiff's Report of the Assault and Treatment in August and September 2013

The parties dispute the extent to which plaintiff was able to see medical staff and obtain medical treatment between August 20—the date of the alleged assault—and September 4, 2013.

---

[4] In a November 9, 2014 letter that plaintiff submitted pro se to the Court, plaintiff indicated that this witness was an individual named "Sergio Diaz," who allegedly lived at 109 Bellmore Rd. in East Meadow.  (ECF No. 28.)

Armor Progress notes indicate that plaintiff was seen by medical staff on August 21, 23, 26 and August 27.  As explained infra, Plaintiff provided vague, confusing, and contradictory deposition testimony concerning these consultations.

According to Armor Progress notes, on August 21, 2013, plaintiff was referred by psychiatric for a detox evaluation, but refused to show up at the medical clinic and told the nurse who went to his cell that he did not want to "go anywhere or see anyone."  (Tauster Decl., Armor Progress notes, ("Defs Ex. L"), ECF No. 133-16.)  Plaintiff testified that he did not recall seeing a nurse on August 21.  (Pl. Dep. 84.)  At the time, plaintiff was going through withdrawal.

An August 23, 2013 Armor Progress note states that:  (1) plaintiff complained of chronic head pain for which he was prescribed 600 milligrams of Ibuprofen; and (2) plaintiff had "bullet wounds" and was taking Keppra for seizures.  (Id.)  An August 26, 2013 progress note states that plaintiff complained of heartburn and appears to have been prescribed Prilosec.  (Id.)  A progress note dated August 27, 2013 indicates that plaintiff complained about a chronic headache and mentioned the 2011 gunshot wound to his head.  (Id.)  The progress notes from August 23, 26, and 27 indicate that plaintiff was examined at the medical department as they include, inter alia, his blood pressure readings, weight, and other examination findings.  (Id.)

At his deposition, plaintiff testified that he could not recall whether he was seen by medical staff on these three dates.  When asked if he went to medical anytime between August 20 and September 5, plaintiff responded:  "I don't remember exactly because I was trying to and I don't know how long did it take for me to get there or didn't.  I can't remember.  It's been a very long time." (Pl. Dep. 80.)  When asked specifically about the August 23 examination, plaintiff testified that he did not recall being seen by medical professionals on that date.  (Pl. Dep. 85.)  When asked about the August 26 visit, plaintiff stated "these things are documented, but I don't remember."

(Pl. Dep. 86:2–3.)  When asked about the August 27 visit, plaintiff testified that he could not recall a visit on "that date, but . . . I'm pretty sure these are things I was trying to address because of the things I was going through."  (Pl. Dep. 86:10-12.)  At one point, plaintiff testified that, after his initial medical visit on August 20, he believed that he was not seen by medical again until "numerous" days later.  (Pl. Dep. 75:18–19.)  However, he could not recall if his second visit to medical occurred more than a week after August 20.  (Pl. Dep. 75, 76, 80.)

Later in his deposition, plaintiff gave some testimony suggesting that he never went to the medical unit on these three dates in August and only spoke with staff who delivered medications to his cell.[5]  (Pl. Dep. 85:19-88:13.)  In this testimony, plaintiff states that he was unable to obtain

---

[5] At his deposition, the following colloquy occurred:

Q: Okay.  So we've just discussed – I'm just going to count -- looks like you were seen by medical on the 21st, the 23rd or at least these records reflect you were seen on the 21st , the 23rd, the 26th , 27th, and then there are multiple subsequent dates.  There are several case entries for 8/27.  So my question to you , sir, is that, is it still your testimony that you were denied medical treatment immediately following your assault?

A:  Yeah.

Q:  Okay.  And is it your testimony that these progress notes are inaccurate , that you weren't in fact treated?

A:  I just don't remember.  Um . . .

Q:  So your testimony is that you don't recall, but in fact you might have been seen by medical professionals, you just don't recall?

MR . ANTWORK:  Objection .

A:  Um, all right , so bottom line, I was seen by -- not by medical, but by the people that would bring the medicine on a daily basis , but I wasn't able to get any appointment or to see the doctor because they wouldn't give me a slip, and every time I told them something, they would tell me to just put in a slip.

Q:  Did you explain to them that you were being denied slips?

A:  I said those things.  They didn't really care, so that's why I said I most likely wrote all these things, but I wasn't seen .

Q:  MR . ANTWORK: Did you write these (indicating)?

an appointment at the medical clinic because the corrections officers ignored his requests for a sick call slip and would not give him a pencil or a slip.  (Pl. Dep. 79, 88:7-89:4.)  This testimony suggests that during this time period he only spoke to the individuals who delivered medication to him and never went to the medical department.  (Pl. Dep. 88.)  Plaintiff admits that he never told the staff who delivered his medication that he had been assaulted by corrections officers.  He maintains that he did not mention the assault to the staff who brought him his medication because he did not want to report the assault in front of the corrections officers.  (Pl. Dep. 88.)

According to plaintiff, "numerous days after" the assault he was finally able to obtain a sick call slip and pencil from other inmates, which resulted in plaintiff being seen at the medical department on September 5.  (Id. 83:8-10.)

Plaintiff first reported the August 20, 2013 assault on September 5, 2013, to Correction Officer Boyd who worked in the medical unit where plaintiff was being seen for a medical visit. (Def. 56.1 ¶ 60.)  Once plaintiff reported the assault on September 5, he was immediately examined by medical staff.  (Defs. Ex. E, F, ECF Nos. 133-9, 133-10.)  Plaintiff reported that he had pain in his head and jaw as a result of the assault.  (Defs. Ex. E.)  Plaintiff, however, has not contended

---

A:  Well, no, no, not these, but I'm saying the sick calls because, I guess if they're going by these dates (indicating).

Q:  And it's your testimony that they told you that in order to go to medical, you needed to fill out a sick slip?

A:  A sick call.  A sick call, okay.

Q:  Did you tell anyone who was coming to see you to give you medication, did you tell them that you were assaulted by jail staff?

A:  Um, no.  I wanted to get to medical and I wasn't able to .

Q:  I'm sorry.  My question was, did you tell, them, yes or no?

A:  No, because the COs were there.

(Pl. Dep.  86–88.)

that, on September 5, he had any visible injuries from the assault.[6]  (Pl. Opp'n Br. at 8 (admitting that "Plaintiff's physical injuries may have dissipated by [September 5]"); <u>see also</u> Def. Ex. F (noting no injuries); Def. Ex. M (stating that no injuries were found), ECF No. 133-17).  Plaintiff was given Tylenol and Motrin for pain and was told to place a sick call if his symptoms persisted or worsened.  (Pl. 56.1 ¶¶ 24, 79).

Plaintiff was interviewed by Sergeant McCann about the assault.  He was unable to provide any of the officers' names, but did identify the date and area of the assault. (Defs. Ex. M.) The incident was reported to Internal Affairs, photos were taken, and an investigator deposed plaintiff on September 6, 2013.  (<u>Id.</u>; Pl. 56.1 ¶ 86.)  On September 12, 2013, Internal Affairs determined that no further action was warranted, noting that plaintiff had waited two weeks to report the matter, he could not identify any of the officers, and no injuries were found.  (Defs. Ex. M; Pl. 56.1 ¶ 87.)  The Internal Affairs report does not reference any attempt to interview the officers or other staff working at the time and in the location of the assault.  (Pl. 56.1 ¶ 111.)  Plaintiff maintains that he was not informed that his internal affairs case was closed on September 12.  (<u>Id.</u>)

After his medical examination on September 5, plaintiff filed a sick call request on September 12, 2013, stating that, after the assault, his jaw has been hurting on the right side. (Pl. Ex. F.)  Plaintiff also complained that "my head still hurts no one wants to give me pain medicine, I have multiple bullet fragments inside my head."  (<u>Id.</u>)  That same day, plaintiff also submitted another sick call request about other issues unrelated to the assault.  Plaintiff was seen by Dr. Sanchez later that day.  (Def. Ex. L.)  The progress notes for this visit state that plaintiff "[illegible] me for [illegible] for his headache which I am willing to prescribe him."  (<u>Id.</u>)

---

[6] There is no evidence in the record that plaintiff had any visible injuries immediately after the alleged assault.

### 3. Plaintiff's Other Sick Call Requests and Grievances

While incarcerated at the NCCC, plaintiff filed at least ten grievances related to: (1) the assault; (2) his housing assignment; and (3) his requests for medical care, including pain medication, anti-seizure medication, a neurologist referral, and a CAT scan. (Pl. Dep. 104:25-105:7; Antwork Decl., Grievances, ("Pl. Ex. E"), ECF No. 134-7.) The particulars of some of these grievances, plaintiff's related sick call requests, and the treatment he received are addressed infra in the discussion of plaintiff's respective claims.

After September 2013, plaintiff submitted certain subsequent sick call requests that asked for stronger pain medication. These sick calls requests reference the bullets in his head and say nothing about the alleged assault.

On December 4, 2013, plaintiff submitted a sick call request seeking Neurontin for the pain in his head. (Pl. Ex. F. at NCSD 000254, ECF No. 134-8.) Plaintiff also submitted a sick call request on December 7, 2013 requesting pain medicine for the bullet fragments in his head because the cold makes it hurt a lot. (Id. at NCSD 000255.) Plaintiff was eventually prescribed Neurontin. (Pl. 56.1 ¶ 29.)

Plaintiff submitted another sick call request on January 6, 2014 stating that Tylenol is not enough and that he "need[s] the right pain medicine for the bullet fragments in [his] head. (Pl. Ex. F at NCSD 000257.)

Between January 9, 2014 and January 24, 2013, plaintiff submitted two sick call slips and one grievance requesting that he be seen by a neurologist and be given a CAT scan. (Def. Ex. E; Pl. Ex. F. In response to these grievances, plaintiff was seen in the medical unit on January 10, 17, 20, 24, and February 12, 2014.

Prior to his incarceration, Plaintiff was under the care of Dr. Holtzman, a neurosurgeon. (Pl. 56.1 ¶ 27.)  Plaintiff testified that Dr. Holtzman informed him that he should have a CAT scan every six to twelve months because of the multiple bullet fragments in his head from the 2011 shooting.  (Pl. 56.1 ¶ 122; Pl. Dep. 122:12-123:23.)  Plaintiff testified that, prior to his August 2013 arrest, he had a CAT scan at some unspecified point in 2013.  (Tr. 123.)

On January 9, 2014, Plaintiff submitted a sick call slip requesting a CAT scan.  (Pl. Ex. F.) On January 10, 2013, plaintiff was seen at the medical unit where he reiterated his request for a CAT scan.  (Def. Ex. E.)  Plaintiff submitted another sick call slip on January 21, 2013, which references "Dr. Parrinella" and states that he needs a CAT scan and was told that he would be seen by a neurologist.  (Id.)  On January 23, 2014, plaintiff requested pain medication for the bullet fragments in his head.  (Id. at NCSD 000262.)

On January 24, 2014, plaintiff filed a grievance about his attempts to see a neurologist and obtain a CAT scan.  In his January 24 grievance, plaintiff complained that "Dr. Parrinello" had told him that he would go see a neurologist, but that a "[l]ady doctor said that is not necessary." (Tauster Decl., Jan. 24, 2014 Grievance, ("Defs. Ex. K"), ECF No. 133-15.)

The grievance investigation form for the January 24 grievance indicates that:  (1) plaintiff was seen by medical on January 24, 2014; (2) a neurology consultation was requested on January 24, 2014; and (3) as of January 30, 2013, a decision on the neurology appointment was pending approval.  (Id.)  Plaintiff was seen again by medical on February 12, 2014 and the progress note for that visit indicates that plaintiff's "neurology referral [was] deferred for more info."  (Defs. Ex. L at 3, see also Def. Ex. K.)  This progress note explains that plaintiff was supposed to complete an "ROI" (release of information) to obtain records from his neurosurgeon.  (Def. Ex. L at 3.)

There is no evidence in the record that plaintiff ever completed the ROI referenced in the February 12, 2014 progress note. Nor is there any evidence indicating when, if at all, Dr. Holtzman responded to a request from Armor for plaintiff's medical records.

Plaintiff testified that, at some unspecified time, he was granted clearance for a neurologist visit and approved for transportation for a visit, but ultimately never saw a neurologist. (Pl. 56.1 ¶ 27; Pl. Dep. 123.) Plaintiff testified that he followed up by making unspecified sick call requests and speaking to the woman doctor referenced in his grievance. (Pl. Dep. 124.) However, the only relevant sick call requests in the record are from January 2014. Plaintiff has not claimed that he filed any grievances concerning the neurology consultation and CAT scan after January 24, 2014 or any sick call requests after his February 12, 2014 visit to the medical unit.

**4. Plaintiff's Release in 2014 and Subsequent Events**

Plaintiff eventually entered into a plea bargain and was released from the NCCC to outpatient treatment on May 23, 2014. (Pl. Dep. 145; July 3, 2014 Ltr., ECF No. 22.) Plaintiff did not receive a CAT scan or see a neurologist before being released in May 2014.

While plaintiff was out of jail and receiving outpatient treatment for his drug addiction, he was rearrested and sent again to the NCCC in or around November 2014. (Pl. Dep. 146, 148; Nov. 9. 2014 Ltr., ECF No. 28.) Plaintiff was eventually transferred from the NCCC to a prison upstate sometime in 2015. (Pl. Dep. 149; Aug. 7, 2015 Ltr., ECF No. 44)

The record does not indicate whether, after being released in May 2014, plaintiff saw his neurologist or made any attempt to obtain a CAT scan before he was arrested again and sent back to the NCCC in approximately November 2014. The record does not reference any grievances or sick calls that plaintiff submitted during his second tenure at the NCCC, which began around November 2014. Plaintiff was eventually released from custody in 2016.

At plaintiff's deposition, which occurred in November 2019—three years after his 2016 release from prison upstate—plaintiff briefly testified about follow-up treatment he received from his neurologist.  Plaintiff testified that, at some unspecified time, he saw Dr. Holtzman when he was out of prison and obtained a CAT scan and other unspecified "tests."  (Pl. Dep.  154–55.)  Dr. Holtzman did not make any diagnosis about plaintiff's jaw.  (Pl. Dep. 156.)  At his deposition, plaintiff testified that since the assault occurred, his jaw has been locking and he is in more pain than before.  (Pl. Dep. 155:4-9.)

**5. Sheriff Sposato**

Sheriff Sposato was employed by the County as Acting Sheriff from 2007-2011, and Sheriff of Nassau County from 2011- 2017.  (Pl. 56.1 ¶¶ 42, 45-46; Antwork Decl., Sheriff Sposato Deposition, Feb. 5, 2020, ("Sposato Dep."), ECF No. 134-6, 16:4-5.)  As the Sheriff, Sposato was the overall oversight manager of approximately forty divisions, including the NCCC.  (Pl. 56.1 ¶ 47.)  Sposato testified that he first became aware of plaintiff when the County Attorney's Office forwarded him plaintiff's Second Amended Complaint.  (Def. 56.1 ¶ 48.)  He testified that he could not recall if he knew about the alleged assault prior to the commencement of plaintiff's lawsuit. (Id. ¶ 58.)

**B. Procedural History**

On December 20, 2013, plaintiff, proceeding pro se, initiated the instant action asserting claims against Armor and the NCSD.  (Compl., ECF No. 1.)  The case was initially assigned to then-District Court Judge Joseph F. Bianco.  On April 23, 2014, Armor moved to dismiss plaintiff's complaint.  (ECF No. 18.)  On August 20, 2014, plaintiff's claims against Armor were voluntarily dismissed without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1).

(ECF No. 27.)  On October 5, 2015, the Court granted plaintiff's motion to amend the Complaint (ECF No. 47), and plaintiff filed an Amended Complaint.  (Amend. Compl., ECF No. 48.)

On January 25, 2016, the Court granted plaintiff's request to reinstate his claims against Armor and also reinstated Armor's motion to dismiss.  (ECF No. 54.)  On April 4, 2016, in accordance with Federal Rule of Civil Procedure 41(a)(1)(A)(i) and 41(a)(1)(B), the Court dismissed the claims against Armor with prejudice and plaintiff informed the Court that he wished to "concede to" Armor's motion to dismiss.  (ECF No. 61.)

On September 9, 2016, counsel appeared on behalf of plaintiff (ECF No. 64), and on December 1, 2016, plaintiff filed a Second Amended Complaint.  (SAC, ECF No. 71.)  On September 15, 2017, the Court denied the NCSD's motion to dismiss the Second Amended Complaint and denied plaintiff's cross-motion to set aside the Court's April 4, 2016 Order dismissing the claims against Armor.  (ECF No. 95.)  On May 31, 2019, the case was reassigned to the undersigned.  (Electronic Order, May 31, 2019.)  On January 31, 2022, defendants filed a fully briefed motion for summary judgment.  (ECF No. 133-135.)

## II. DISCUSSION

### A.  **Standard of Review**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotation marks and citation omitted). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. Anderson, 477 U.S. at 249.

## B. Claims Against the John Doe Defendants

Defendants seek summary judgment of plaintiff's claims against the "John Doe" defendants because plaintiff has failed to identify the unnamed defendants. (Defs. Mot. at 9-13.) The Court agrees.

Using "John Doe" in lieu of an individual defendant's name does not adequately identify that person. See Coward v. Town & Vill. of Harrison, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009). However, "[c]ourts typically resist dismissing suits against John Doe defendants until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials." Id.

(internal quotation marks and citation omitted).  Nonetheless, where a plaintiff has had ample time to identify a John Doe defendant and still has not done so, a plaintiff cannot continue to maintain a suit against the John Doe defendant.  Id.; see also Watkins v. Doe, 04-CV-0138, 2006 WL 648022, at *3 (S.D.N.Y. Mar. 14, 2006) (dismissing without prejudice claims against "Doe" defendants where "despite having the full opportunity to conduct discovery, plaintiff has not yet identified and served [those] defendants").

Here, plaintiff has had ample time to identify the John Doe officer defendants, but has failed to do so.  In the Court's September 15, 2017 Order, Judge Bianco denied the County's motion to dismiss plaintiff's complaint against the John Doe defendants as premature, acknowledging that Second Circuit law requires that plaintiff be afforded an opportunity to learn the identities of the responsible officials.  (Sept. 15, 2017 Order, ECF No. 95; see transcript of proceedings, ECF No. 117.)  Specifically, Judge Bianco noted:

> The fact that the plaintiff is blind here, and obviously would have additional issues with trying to identify who the officers were, you get another reason why, I think, the court should give the plaintiff the opportunity to obtain discovery and seek to identify the individual officers. . . . Obviously, if the plaintiff gets all the discovery in the case, and still can't identify the officers, th[en] the county can certainly raise that again with the court in a summary judgment motion.

(Tauster Decl., partial transcript  of J. Bianco's Sept. 15, 2017 proceedings, ("Defs. Ex. S"), ECF No. 133-23, 4:24-5:7.)

Discovery has now been completed, yet plaintiff has neither moved to substitute the names of the individual officers nor has indicated that he has learned the identity of the officers.  Fact discovery began on February 20, 2014 and was extended six times, ultimately ending on September 25, 2020—four years after plaintiff obtained counsel.  On November 12, 2018, defendants responded to plaintiff's discovery requests with copies of line-up sheets, identifying the NCCC staff on duty on August 20, 2013, and their respective security post assignments.

(Tauster Decl., County defendants' Discovery Response, ("Defs. Ex. P"), ECF No. 133-20.) Despite the Court granting of multiple requests by the parties to extend discovery, plaintiff never sought additional discovery to identify the officers nor did he depose anyone other than Sheriff Sposato.  Further, as defendants point out, despite his claim that an individual named Domingas witnessed the alleged assault, plaintiff never sought any information during discovery that would have enabled him to locate this potential witness.  (Defs. Mot. at 12.)

Plaintiffs' arguments against dismissal of the John Doe defendants are meritless.

First, plaintiff argues that Defendants' responses to discovery were incomplete and inadequate.  Plaintiff contends that the County's November 12, 2018 discovery response was incomplete because it was missing a page—bate stamped #000378—which would list the correction officers assigned to the medical unit on August 20, 2013.  (Pl. Opp'n at 10.)  Plaintiff also insists that Sposato, who was deposed, was also the County's 30(b)(6) witness and was not adequately prepared to serve in that role.

Plaintiff's opposition papers in response to a summary judgment motion are not the place to litigate these untimely discovery disputes.  Plaintiff, who was represented by counsel during discovery, could have filed a motion to compel production of the purportedly deficient document production any time between defendants' 2018 production and the end of the lengthy discovery period two years later.  Similarly, plaintiff had an opportunity to raise any issues involving the 30(b)(6) deposition before the close of discovery.[7]

Furthermore, plaintiff's attempt to stave off summary judgment on the basis of these purported discovery deficiencies also fails, procedurally, under Rule 56.

---

[7]  The County disputes that Sposato was ever designated as a 30(b)(6) witness.  This dispute is ultimately irrelevant because, plaintiff should have raised this 30(b)(6) issue and other discovery disputes before the close of discovery.

Federal Rule of Civil Procedure 56(d) states:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

>   (1) defer considering the motion or deny it;

>   (2) allow time to obtain affidavits or declarations or to take discovery; or

>   (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

Plaintiff has not submitted an affidavit or declaration pursuant to Rule 56(d).  Accordingly, his argument based on defendants' purportedly deficient discovery responses fails and is not a ground to fend off dismissal of the John Doe defendants.

Second, plaintiff's argument that his legal blindness excuses him from identifying the John Doe defendants is equally unavailing.  Judge Bianco's order denying defendant's motion to dismiss acknowledged plaintiff's blindness and provided him with more than ample time to conduct discovery to identify the officers.

Third, plaintiff's reliance on Webb v. Miller, No. 18CV610, 2020 WL 1227155, at *3 (N.D.N.Y. Mar. 12, 2020) is misplaced.  In Webb, a pro se plaintiff was unable to identify two John Doe defendants.  While discovery in Webb was already closed, the court nevertheless denied a motion to dismiss the John Doe defendants, directed the Attorney General's Office to identify these two defendants, and granted the pro se plaintiff an extension of time to serve those defendants.  Notably, in Webb, the court had issued, at the outset of the litigation, an order— pursuant to Valentin v. Dinkins, 121 F.3d 72 (2d. Cir. 1997) (per curiam)—which directed the Attorney's General's Office to identify the John Doe defendants in plaintiff's complaint given plaintiff's pro se status.  Despite this order, the Attorney General's Office had failed to identify the John Doe defendants at issue.

Webb is distinguishable on multiple grounds.  Critically, Webb involved an incarcerated pro se plaintiff who, unlike Neira, did not have the benefit of counsel during discovery.  Moreover, here, the County was not previously directed, in a Valentin order, to identify the John Doe defendants.[8]  It is also notable that the court in Webb denied the motion to dismiss the John Doe defendants less than two years after the filing of plaintiff's complaint and the issuance of the Valentin order.  By contrast, the instant case has been pending since 2013 and plaintiff's counsel had four years in which to seek any necessary discovery in order to identify the John Doe defendants.

Finally, plaintiff cites to a number of inapposite cases involving challenges to prison disciplinary hearings.  See, e.g., Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991). None of these cases support plaintiff's attempt to avoid dismissal of the John Doe plaintiffs.

Based on the foregoing, the Court finds plaintiff was afforded ample opportunity to identify the John Doe officer defendants, yet has failed to do so.  Therefore, plaintiff's claims against the John Doe defendants must be dismissed.  See Caravalho v. City of New York, No. 13-CV-4174, 2016 WL 1274575, at *11 (S.D.N.Y. Mar. 31, 2016) (dismissing claims against John Doe officers on summary judgment after plaintiffs were unable to discern their identities through discovery).

Accordingly, the Court dismisses the Second Amended Complaint as against the John Doe defendants, without prejudice, in light of plaintiff's failure to identify and serve them after the completion of discovery.

---

[8]  The Court also notes that Valentin orders are particularly appropriate when a pro se plaintiff is incarcerated.  Here, plaintiff was not only represented by counsel during four years of discovery, but plaintiff was also released from prison in 2016 and was apparently out of prison during most, if not all, of the ensuing four years during which discovery was conducted.  (ECF No. 63.)

C.  **Claims Against the NCCC and NCSD:**

Plaintiff names the NCCC and the NCSD as defendants.  However, "[i]t is well-established that departments that are merely administrative arms of a municipality do not have an independent legal identity apart from the municipality and, therefore, cannot sue or be sued."  <u>Davis v. Riverhead Correction Facility</u>, No. 11-CV-5667, 2011 WL 6131791, at * 2 (E.D.N.Y. Dec. 6, 2011); <u>see</u> <u>Gleeson v. County of Nassau</u>, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (finding NCSD and NCCC were not proper parties because they are administrative arms of Nassau County).  Since the NCCC and the NCSD are administrative arms of Nassau County, without a legal identity separate and apart from the County, they lack the capacity to be sued.

Accordingly, plaintiff's claims against the NCCC and the NCSD are dismissed with prejudice.

D.  **General Standards for Section 1983 Claims**

Plaintiff alleges that the remaining defendants—the County and Sheriff Sposato—violated his constitutional rights because he was denied adequate medical care, placed in the same housing unit as the individual that had previously shot him in the head, and subjected to excessive force. Plaintiff further claims that the County is liable for the acts of these individual defendants pursuant to <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658 (1978) and that Sheriff Sposato is liable both personally, and in his official capacity as a supervisory employee of the County.

Section 1983 provides a remedy for constitutional deprivations occasioned by state actors. To maintain a Section 1983 claim, the plaintiff must establish that the conduct complained of: (1) was committed by a person acting under color of state law; and (2) deprived the plaintiff of rights, privileges, or immunities secured by the United States Constitution or laws of the United States.

See Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).  Further, to sustain a Section 1983 action against an individual defendant, "a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation."  Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013).

When a plaintiff asserts a Section 1983 claim against a municipal defendant, plaintiff must also demonstrate that the constitutional deprivation "resulted from a municipal custom or policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991).  Municipal liability is "an extension of liability, not an independent cause of action, and therefore requires an underlying constitutional violation."  Soto v. City of New York, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015) (citing Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)).

For the reasons discussed below, plaintiff's Section 1983 claims fail as a matter of law.

**E.  Excessive Force**

Plaintiff alleges excessive force claims under the Fourth and Fourteenth Amendments.[9] Though his excessive force claim was dismissed as against the John Doe officers, the Court must still address the County's potential liability for plaintiff's excessive force claim because municipalities may be liable even where the plaintiff does not sue the individual tortfeasors and proceeds solely against the municipality.  Askins v. Doe No. 1, 727 F.3d 248, 253-54 (2d Cir. 2013).  Additionally, the Court must evaluate plaintiff's excessive force claim against Sheriff Sposato in his individual capacity.[10]

---

[9]  The Court will evaluate plaintiff's excessive force claim under the Fourteenth Amendment which protects pre-trial detainees from the use of excessive force; whereas, the Fourth Amendment protects arrestees from excessive force during an arrest.  Graham v. Connor, 490 U.S. 386, 394, 395 n. 10 (1989).  Additionally, the Court notes that plaintiff's second cause of action, a Section 1983 claim for cruel and unusual punishment, is duplicative of his first cause of action, a Section 1983 claim for use of excessive force.

[10]  Plaintiff's claims against Sherriff Sposato in his official capacity are redundant to the claims against Nassau County and are therefore dismissed.

Plaintiff has identified the date and location of the alleged force and described the alleged force.  The Court assumes that plaintiff's deposition testimony and evidentiary proffers would allow a jury to find that the correction officers used excessive force during the alleged assault on August 20.

However, as discussed below, because there is no evidence of municipal liability or Sposato's individual liability, plaintiff's excessive force claims against the County and Sheriff Sposato must be dismissed.

**1.  County's Liability under <u>Monell</u>**

Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom, policy or usage of the municipality.  <u>Monell</u>, 436 U.S. at 690-91; <u>Jones v. Town of E. Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012).  Absent such a custom, policy, or usage, a municipality cannot be held liable on a <u>respondeat</u> <u>superior</u> basis for the tort of its employee.  <u>Monell</u>, 436 U.S. at 691; <u>see</u> <u>also</u> <u>Connick v. Thompson</u>, 563 U.S. 51, 60 (2011) (holding that under Section 1983, governmental bodies are not vicariously liable for their employees' actions).  Further, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  <u>Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown</u>, 520 U.S. 397, 404 (1997).  A municipality is the moving force behind the alleged injury where there is "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  <u>Outlaw v. City of Hartford</u>, 884 F.3d 351, 373 (2d Cir. 2018).

"[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." Jones, 691 F.3d at 81 (citing Villante v. Department of Corrections of the City of New York, 786 F.2d 516, 519 (2d Cir. 1986).  However, "such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." Id. (citing Amnesty, 361 F.3d at 125–26.)  A plaintiff may "prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them."  Id. (citing Amnesty Am., 361 F.3d at 126.)  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[,]"  Connick, 563 U.S. at 61 (quotations and citation omitted), and "requires a showing that the official made a conscious choice, and was not merely negligent."  Jones, 691 F.3d at 81.

Plaintiff fails to meet this standard.

The bulk of plaintiff's "Monell" evidence is unrelated to plaintiff's excessive force claim and instead concerns alleged deficiencies in the provision of medical care at the NCCC by Armor and the County and other issues involving conditions of confinement at the NCCC, including overcrowding.

In an effort to establish Monell liability for his excessive force claim, plaintiff relies primarily on a Department of Justice ("DOJ") investigation from 2000 which found that conditions at the NCCC rose to the level of constitutional violations because the facility was deliberately

indifferent to inmates' serious medical needs and the use of excessive force against inmates.  (Pl. Opp'n at 15; Pl. 56.1 ¶ 130; Antwork Decl., ("Pl. Ex. L"), ECF No. 134-14.)  As a result of this investigation, in 2002, the United States Attorney General filed a complaint in this Court alleging, inter alia, that the NCCC engaged in a pattern or practice of using excessive force against inmates, failed to train and supervise correctional staff adequately to prevent the use of excessive force, failed to maintain policies pertaining to the use of force and failed to investigate complaints alleging the use of excessive force.  (Pl. Ex. L.) The lawsuit resulted in a consent decree that directed the NCCC to make significant changes to its policies regarding the use of force and required DOJ monitoring of the jail until 2008.  (Id.)  The consent decree, however, was vacated in 2008 after it was determined that the jail was in compliance.  (Id.; Pl. 56.1 ¶ 130.)

This report, litigation, and consent decree—which concerned conditions at the NCCC years before plaintiff's assault—is too attenuated to establish Monell liability on plaintiff's excessive force claim.  See Zander v. City of New York, No. 17-CV-611, 2019 WL 1409440, at *6 (S.D.N.Y. Mar. 28, 2019) (finding causal relationship between assault of plaintiff in 2015 and DOJ Report addressing conduct between 2011 through 2013 was too attenuated to survive summary judgment on Monell claim).  Moreover, plaintiff's reliance on this evidence is undermined by the fact that the consent decree at issue was vacated in 2008 after it was determined that the jail was in compliance with the consent decree.

None of plaintiff's other Monell evidence establishes Monell liability for plaintiff's excessive force claim.

Plaintiff cites to a 1990 amendment to the Nassau County Charter that required the County Executive to appoint a Board of Visitors for the NCCC.  (Pl. Ex. L; Marone v. Nassau Cnty, 967 N.Y.S.2d 583, 585 (N.Y. Sup. Ct. 2013))  The Board of Visitors was tasked with, inter alia,

investigating inmate complaints and grievances.  (Pl. Ex. L.)  For years, no members were appointed to the Board of Visitors.  (Id.)  In 2012, a civil suit was brought by the New York Civil Liberties Union ("NYCLU") to compel the Nassau County Executive to appoint members to the Board of Visitors.  (Id.)  In March 2013, a state court ordered the County Executive to appoint a full slate of seven members to the Board of Visitors within 90 days.  (Id.)  This evidence about the County's failure to appoint the Board of Visitors is too generalized and attenuated to establish Monell liability for plaintiff's excessive force claim.[11]  A jury could not find "a direct causal link" between vacancies on the Board of Visitors and "the alleged constitutional deprivation" here. Outlaw, 884 F.3d at 373.

Plaintiff also relies on two lawsuits filed by the NYCLU.  In 2012, the NYCLU brought an action on behalf of NCCC inmates concerning five inmate suicides occurring between 2010 and 2012 and the prison's failure to meet minimum standards for medical care.  (Pl. 56.1 ¶ 136; Pl. Exs. H, L.)  This is the same lawsuit discussed above in which the plaintiffs sought to compel the County Executive to appoint members to the Board of Visitors.  This lawsuit involved allegations of inadequate medical care and the record does not indicate that this lawsuit even involved allegations of excessive force.  Plaintiff also cites to another lawsuit that the NYCLU filed against the NCCC in 2011 for its alleged failure to comply with FOIL requests for the release of information concerning the medical and mental health care of inmates.  (Pl. 56.1 ¶ 134.)

These two lawsuits do not support plaintiff's Monell claim as neither suit even involved allegations of excessive force.  Moreover, even if these suits did involve claims of excessive force,

---

[11]  Plaintiff's 56.1 statement asserts, based on "information and belief," that "after much delay, the board members were only recently nominated and . . . confirmed by the County legislature."  (Pl. 56.1 ¶ 129.)  A 56.1 statement is not a complaint where facts may be alleged based on "information and belief."  Rather, a 56.1 statement must reflect evidence that is actually in the record before the Court.  In any event, even assuming that this is what occurred, it is insufficient to establish Monell liability here.

"a plaintiff's citation to a few lawsuits involving claims of alleged excessive force is not probative of the existence of an underlying policy by a municipality, police department, or department of corrections[.]" Ameduri v. Vill. of Frankfort, 10 F. Supp. 3d 320, 341 (N.D.N.Y. 2014) (citing Jean–Laurent v. Wilkerson, 461 F. App'x. 18, 22–23 (2d Cir. 2012)).

Plaintiff also cites to a 2009 report from the New York State Commission of Correction which found that the NCCC was not in compliance with the minimum standards for correctional facilities.  Notably, the 2009 report itself is not even part of the record before this Court.  Instead, plaintiff relies on a state court decision from the 2012 NYCLU lawsuit which summarizes this report.  (Pl. Ex. L.)  According to the state court's brief summary of the 2009 report, the report identified twenty-five steps that the NCCC needed to take in order to comply with the required minimum standards.  The state court decision identifies three of these steps, stating that that the NCCC needed to:  (1) establish a sanitary shower environment; (2) provide laundry detergent; and (3) stop ignoring inmate grievances.  (Pl. Ex. L.)  The record before this Court does not identify the other twenty-two steps identified in the 2009 report and there is no evidence before the Court that this report addressed allegations of excessive force.  The evidence of the 2009 report before this Court is clearly insufficient to establish Monell liability for plaintiff's excessive force claim.[12]

Finally, plaintiff mentions, with no further explanation, that there were no cameras on block B2A where plaintiff was assaulted.  (Pl. Opp'n. at 16; Pl. 56.1 ¶¶ 56.1 61, 137).  The Court assumes that plaintiff is claiming that the County is liable because it failed to monitor the activities occurring in the prison.  However, "[i]f Plaintiff's argument were correct, it would require surveillance cameras to be installed in all areas at every prison where inmates" are at a risk of

---

[12]  At best, the general reference in this report to the jail ignoring inmate grievances might be somewhat helpful to plaintiff.  However, the record before this Court—which provides no further detail on this point—is insufficient to establish Monell liability on plaintiff's excessive force claim.

suffering unconstitutional misconduct.  Lewis v. Hanson, No. 18-CV-12, 2020 WL 1812556, at *11 (N.D.N.Y. Apr. 9, 2020) (rejecting claim that failure to install video surveillance cameras at prison was grossly negligent).  The fact that there were no cameras in the hallway where plaintiff was assaulted is insufficient to raise a genuine issue of material fact that would preclude summary judgment.

The Court has considered all of plaintiff's Monell evidence cumulatively and concludes that a reasonable jury could not find the County liable, under Monell, for the excessive force claim. Beyond the facts of his own isolated incident, plaintiff has not identified sufficient evidence suggesting the existence of any municipal policy or custom with respect to excessive force at the NCCC.  See Jones, 691 F.3d at 81; City of Oklahoma v. Tuttle, 471 U.S. 808, 823-824 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."). Therefore, because there is no evidence from which a reasonable jury could find that the alleged violation of plaintiff's rights was the result of a policy, practice, or custom of the County, the County is entitled to summary judgement on plaintiff's excessive force claim.

**2. Sheriff Sposato's Liability**

"It is well-settled that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (citation omitted).  "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority[.]'" Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004) (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)).

"Supervisory liability is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates."   Carter, 394 F. Supp. 3d at 243 (quoting Burwell v. Peyton, 131 F. Supp. 3d 268, 302 (D. Vt. 2015).  Until recently, plaintiffs could establish the liability of a supervisory official for a subordinate's conduct under Section 1983 by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of the plaintiffs by failing to act on information indicating that unconstitutional acts were occurring.

Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020) (brackets omitted) (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).  However, the Second Circuit recently held that "after Iqbal, there is no special rule of liability for supervisors," and instead, "[t]he violation must be established against the supervisory official directly."  Id. at 618.  Therefore, a government or prison official is not personally involved in the violation of a plaintiff's constitutional rights simply "by reason of [the official's] supervision of others who committed the violation."  Id. at 619.  Rather, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Id. at 618, 619 (explaining that, to establish an Eighth Amendment deliberate indifference claim against a supervisory official, "the official must know[ ]of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.") (internal quotations omitted).

Plaintiff has not met this standard on his excessive force claim.  Plaintiff asserts, in conclusory fashion, that Sheriff Sposato demonstrated deliberate indifference to his constitutional rights by "fail[ing] to remedy the known, ongoing, constitutionally offensive conditions of the NCCC and that he created, tolerated and/or condoned the policy and custom under which such violations occurred."  (Pl. Opp'n. at 23).  Yet plaintiff offers no evidence to establish that Sheriff Sposato had any personal involvement in plaintiff's alleged constitutional deprivation with respect to the assault.  Instead, plaintiff simply argues that "having been Sheriff from 2007 through 2017, [Sposato] was charged with being: the overall oversight manager for multiple divisions in the sheriff's department; overall manager of the jail, including management of correction officers, . . .; and the overall manager of the NCCC."  (Id.)  Plaintiff cites to emails and reports sent to Sheriff Sposato regarding conditions at the NCCC related to allegations of inadequate medical care and inmate suicides between 2011 and 2012.  (Pl. Ex. H.)[13]  Such evidence fails to demonstrate that Sheriff Sposato knew of and disregarded an excessive risk to plaintiff's health or safety.  See Tangreti, 983 F.3d at 619.  Further, Sheriff Sposato testified that he did not even become aware of the plaintiff until the County Attorney's Office forwarded him plaintiff's Second Amended Complaint.  (Sposato Dep. 27:23-28:21.)  Even before Tangreti, courts recognized that "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."  Richardson v. Goord, 347 F3d 431, 435

---

[13] Plaintiff's Ex. H is a compilation of 23 pages of emails and reports that Sposato received concerning issues at the Nassau County jail.  Almost all of the emails concern issues involving medical care at the jail.  Plaintiff's 56.1 statement does not identify any emails concerning claims of excessive force.  The Court notes that one email in this exhibit dated April 15, 2011 does concern a claim of excessive force.  Plaintiff, however, does not rely on this specific email and, in any event, this email is clearly insufficient to establish Sposato's personal involvement in the 2013 assault on plaintiff.  The April 15, 2011 email simply recounts an internal affairs investigation into the allegations of a single inmate who alleged that excessive force was used against him.  Moreover, this email is not even helpful to plaintiff as it indicates that Internal Affairs conducted a thorough investigation into the alleged use of excessive force. This email—which plaintiff never even explicitly relies on—is clearly insufficient to establish Sposato's personal involvement or Monell liability on plaintiff's excessive force claim.

(2d Cir. 2003) (quoting <u>Ayers v. Coughlin</u>, 780 F.2d 205, 210 (2d Cir. 1985); <u>see also</u> <u>Wright v.</u> <u>Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant in a Section 1983 action may not be held liable for constitutional violations merely because he held a high position of authority).

Therefore, because there is no evidence to create a genuine issue of material fact that Sheriff Sposato violated plaintiff's constitutional rights, the Fourteenth Amendment excessive force claim against him must be dismissed.

## F.  Inadequate Medical Care Claims – Deliberate Indifference

Plaintiff contends that defendants are liable under the Eighth and Fourteenth amendments for the inadequate medical care he received while detained at the NCCC.  Specifically, plaintiff alleges that defendants violated his constitutional rights by: (1) denying him medical care following the alleged assault, (SAC ¶ 47); (2) denying or unreasonably delaying his requests for medical care and medication related to his pre-existing conditions, (SAC ¶ 51); and (3) denying or ignoring his requests for a neurology visit and CAT scan.  (SAC ¶ 52).  He also claims that: (1) given his blindness, he should have been given a bottom cell so that he would not fall down the stairs; (2) he was not given necessary nutritional supplements; and (3) defendants caused him to contract MRSA and failed to adequately treat this infection.

As discussed below, defendants are entitled to summary judgment because plaintiff has failed to establish that he received inadequate medical care while he was incarcerated at the NCCC.[14]

---

[14]  Defendants also argue that they are entitled to summary judgment on these claims because:  (1) plaintiff cannot establish <u>Monell</u> liability for these claims; and (2) plaintiff already dismissed Armor from this lawsuit.  The dismissal of Armor does not absolve the County of its potential liability for Armor's conduct, <u>see</u> <u>Gil v. Vogilano</u>, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001).  As for the County's <u>Monell</u> arguments, with one exception addressed below, the Court declines to address the issue of <u>Monell</u> liability for plaintiff's claims concerning his medical care because those underlying claims fail on the merits.

### 1.  Standard for Deliberate Indifference

To establish a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[15]  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  To prevail on a Fourteenth Amendment deliberate indifference claim, a plaintiff must satisfy a two-part test: "(1) that the alleged deprivation [of medical treatment] 'pose[d] an unreasonable risk of serious damage to his health,' and (2) 'that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed.'" Adamson v. Miller, 808 F. App'x 14, 18 (2d Cir. 2020) (quoting Darnell, 849 F.3d at 30, 35).

The first part of the test is an objective determination, requiring the plaintiff to demonstrate that "the inadequacy in medical care is sufficiently serious."  Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006).  Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  Id. at 279-80 (citations omitted) ("Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment [or

---

[15] Plaintiff invokes both the Eighth and Fourteenth Amendments of the Constitution.  However, it is unclear from the record whether plaintiff was a pretrial detainee or an incarcerated prisoner at the time of the alleged constitutional violations.  This distinction is relevant as the Second Circuit held that the standard for deliberate indifference depends on whether the plaintiff is a pre-trial detainee, in which case the claim arises under the Fourteenth Amendment, or a convicted prisoner, in which case the claim arises under the Eighth Amendment.  Darnell v. Pineiro, 849 F.3d 17, 32-36 (2d Cir. 2017); see, e.g., A.T. ex rel. Tillman v. Harder, 298 F. Supp. 3d 391, 413 (N.D.N.Y. 2018) (discussing relaxation of deliberate indifference standard for Section 1983 claims brought by pre-trial detainees).  The record suggests that plaintiff was a pretrial detainee until at least February 2014 when he pled guilty.  Ultimately, whether analyzed under the Eighth Amendment or the Fourteenth Amendment, plaintiff's claims of deliberate indifference fail.  Thus, for purposes of this Memorandum and Order, the Court will consider plaintiff's claims under the Fourteenth Amendment which provides "slightly greater protection" to pre-trial detainees than the Eighth Amendment standard applied to convicted prisoners.  Carter v. Broome County, 394 F. Supp. 3d 228, 240 (N.D.N.Y. 2019) (citation omitted).

Fourteenth Amendment] violation.").  "For a constitutional violation to occur based on deliberate indifference to a prisoner's medical need, the deprivation of medical care must be 'sufficiently serious' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists."  Yancey v. Robertson, 828 F. App'x 801, 803 (2d Cir. 2020) (summary order) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).  If a plaintiff alleges that the prison provided inadequate care—rather than a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]"  Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702-03 (2d Cir. 1998)).

The second component of the deliberate indifference standard, the subjective prong, or "mens rea prong" is defined objectively and requires showing that the defendant "acted with a sufficiently culpable state of mind"— that is, with at least "deliberate indifference."  Warren v. City of N.Y. Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at *9 (E.D.N.Y. Mar. 26, 2021); see also Darnell, 849 F.3d at 29.  To satisfy the subjective prong, a plaintiff must show that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendant] knew, or should have known, that the condition posed an excessive risk to health or safety."  Darnell, 849 F.3d at 35.  Thus, a plaintiff must prove "that an official acted intentionally or recklessly, and not merely negligently."  Id. at 36.  "[M]ere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'"  Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir.

2000) (quoting Chance, 143 F.3d at 703 (internal quotation marks omitted)).  Moreover, it is well-established that "[a] claim based on an inmate's disagreement with the defendants' medical judgment as to the proper course of treatment cannot support a constitutional claim for deliberate indifference."  Mena v. City of New York, No. 13-CV-2792, 2018 WL 4328827, at *5 (E.D.N.Y. Sept. 11, 2018) (citing Simpson v. Oakes, 640 F. App'x 86, 88 (2d Cir. 2016)).

### 2.  Treatment for Plaintiff's Injuries from the Alleged Assault

Plaintiff brings deliberate indifference claims for the allegedly insufficient treatment he received for his injuries from the assault.  These claims fail on multiple grounds.

#### i.  Plaintiff's Alleged Injuries Do Not Demonstrate a Sufficiently Serious Medical Need

Plaintiff has not established, as a threshold matter, that his purported injuries were sufficiently serious to give rise to a deliberate indifference claim.  The entire record—including plaintiff's testimony, the Armor Progress notes, and the September 5 examination of plaintiff—does not show that plaintiff suffered a sufficiently serious injury as a result of the assault.  See, e.g., Hathaway, 37 F.3d at 66 (condition must be a "condition of urgency, one that may produce death, degeneration, or extreme pain").  "It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need."  Cain v. Jackson, No. 05-CV-3914, 2007 WL 2193997, at *5 (S.D.N.Y. July 27, 2007) (citation omitted).  According to the Armor Progress notes, prior to September 5, 2013 plaintiff complained about other ailments, but made no mention of the assault, any injury caused by the assault, or any pain in plaintiff's jaw. Moreover, when plaintiff was examined on September 5, he had no visible injures.  (Pl. Opp'n Br. at 8 (admitting that "Plaintiff's physical injuries may have dissipated by [September 5]); see also Def. Ex. F (noting no injuries); Def. Ex. M (stating that no injuries were found).)  A jury could not find that plaintiff suffered a sufficiently serious injury as a result of the assault.

Moreover, even assuming <u>arguendo</u> that plaintiff's injuries were sufficiently serious to require some treatment under the Fourteenth Amendment, plaintiff does not have viable claims based on the allegedly inadequate treatment he received.

### ii.  *Alleged Delay in Treatment Between August 20 and September 5*

Plaintiff claims that following the August 20, 2013 assault, corrections officers ignored his request to go to the medical department and requests for a pencil and medical slip so that he could request a sick visit at the medical department.  (Pl. Dep. 75–81; Pl. Opp'n. at 17-18; Pl. 56.1 ¶ 102.)  Plaintiff contends that the corrections officers' actions prevented him from obtaining medical care for his injuries until September 5.  Plaintiff asserts that the corrections officers prevented him from receiving medical treatment in an effort to cover up the assault.  (SAC ¶ 47.)  Plaintiff's deliberate indifference claim based on these allegations fails.

First, there is insufficient evidence for a reasonable jury to find that corrections officers prevented plaintiff from visiting the medical department between August 21 and September 4.  Plaintiff contends that he did not visit the medical unit during this time period and, instead, only spoke with staff who delivered his medication.  As a factual matter, this claim is patently absurd given both the Armor progress notes and plaintiff's own testimony that he could not recall or remember when questioned about the specific interactions documented in these notes.  Notably, the handwriting and signatures on these progress notes indicate that three different individuals entered detailed information regarding plaintiff's health between August 22 and August 27, 2013.  And  the  information  entered  on  these  notes—which  includes  examination  findings  and prescriptions for medication—makes it clear that these notes were the result of examinations at the medical unit and were not from plaintiff's interactions with the staff who simply delivered

medication to plaintiff's cell.[16]  A reasonable jury could not find, based on plaintiff's vague and equivocal testimony and the Armor progress notes, that plaintiff was prevented from obtaining appointments at the medical office between August 21 and September 4.  As such, plaintiff's claim that he was denied medical treatment by the corrections officers fails.

Second, even assuming arguendo that a jury could find that the corrections officers prevented plaintiff from going to the medical unit between August 20 and September 4, in order for the County or Sheriff Sposato to be held liable, plaintiff would have to establish Monell liability for the County and Sposato's personal involvement in the violation.  As explained previously, plaintiff does not have a viable claim under either theory against defendants based on the alleged conduct of the corrections officers in assaulting plaintiff.  Relatedly, plaintiff also does not have viable arguments under either theory to hold these two defendants liable for an underlying claim based on the corrections officers withholding medical slips and preventing plaintiff from obtaining a medical appointment between August 20 and September 4.  Plaintiff has not pointed to any Monell evidence which suggests a custom or policy involving correction officers withholding medical slips and preventing inmates from being seen at the medical unit.  Notably, even plaintiff maintains that the officers' actions were intended to cover up the assault.  There is simply insufficient evidence to establish Monell liability or Sposato's liability for either the assault or the attempted cover-up, which the corrections officers allegedly orchestrated by preventing plaintiff

---

[16]  Nothing in the record indicates that staff who are tasked with delivering medication to inmates can provide additional medication for an inmate without the inmate first visiting the medical clinic.

from going to the medical department.[17]   Accordingly, defendants are entitled to summary judgment on plaintiff's claims against them based on the correction officers' post-assault conduct.

### iii.  The Allegedly Inadequate Pain Medication that Plaintiff Received to Treat His Pain from the Assault

Plaintiff appears to assert that, after he reported the assault on September 5, the treatment he subsequently received was inadequate because he should have been given stronger pain medication.[18]   (See Pl. 56.1 ¶ 123.)  This claim fails.

Plaintiff's claim that medical staff should have given him stronger medication than Tylenol and Motrin for his pain does not demonstrate that Armor personnel were deliberately indifferent to his medical condition.  See Veloz v. New York, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (medical providers' decision to prescribe Tylenol rather than stronger pain medication for prisoner's back condition did not state a claim for deliberate indifference); Vail v. Lashway, 9:12-CV-1245, 2014 WL 4626490, at *14 (N.D.N.Y. Sept. 15, 2014) ("[T]he decision to choose one form of pain medication over another . . . is not indicative of deliberate indifference.").  Given the record concerning plaintiff's purported injuries from the assault, a reasonable jury could not conclude that the facility's refusal to prescribe him stronger pain medication constituted deliberate indifference.

---

[17]  Plaintiff maintains that there is evidence of widespread and patent deficiencies in the medical care that Armor provided to inmates at the NCCC.  As such, plaintiff maintains that he can establish Monell liability for his underlying claims that he received inadequate medical care at the NCCC, including Armor's failures to prescribe him necessary medication and to send him for a CAT scan.  (Because those claims of inadequate medical care ultimately fail on the merits, it is unnecessary to reach the question of Monell liability for those claims).  The Court notes that the specific claim addressed above—namely, that the corrections officers withheld medical slips and prevented him from going to the medical department in order to cover up the assault—is categorically different than plaintiff's claims that Armor provided inadequate medical care to plaintiff and other inmates who were seen by medical staff in the medical clinic. Plaintiff's "Monell" evidence concerning deficient medical care by Armor is insufficient to establish Monell liability based on the actions of corrections officers who, in an effort to cover up the assault, prevented him from securing an appointment at the medical unit.

[18]  Plaintiff does not identify any other specific actions that he claims the medical staff should have taken in September 2013 to treat his purported injuries from the alleged assault.

Notably, prior to his August 2013 arrest, plaintiff was using heroin and abusing the oxycodone he had been prescribed.  (Pl. Dep. 127–28, 137.)  Upon his admission to the NCCC, Plaintiff suffered through withdrawal.  (Pl. 56.1 ¶ 17; Pl. Dep. 68:4-8.)  Given all the circumstances here, there was ample reason not to prescribe oxycodone for plaintiff's complaints of pain and to instead treat his pain with other medication.  See Wright v. Genovese, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) ("[C]oncern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgment about what drug to prescribe.").  Plaintiff cannot establish deliberate indifference concerning the pain medication he received.

### 3.  Plaintiff's Pre-existing Condition from the Gunshot Wounds to His Head

With regard to plaintiff's pre-existing condition, there is no dispute that plaintiff's traumatic brain injury and seizure disorder constitute serious medical conditions.  However, the evidence fails to demonstrate that defendants "failed to act with reasonable care to mitigate the risk that his condition posed."  Darnell, 849 F.3d at 35.  In fact, the evidence establishes that plaintiff was treated somewhat regularly by medical staff at the NCCC and was prescribed medications to treat his pre-existing conditions.  (See Defs. Ex. L; Antwork Decl., Sick call requests, ("Pl. Ex. F"), ECF No. 134-8.)

Plaintiffs raises various claims concerning the treatment he received for his pre-existing conditions.  All of these claims fail.

#### i.  Plaintiff's Pain Medication

Plaintiff argues that he should have been given stronger pain medication to treat the pain from his pre-existing brain injury.  This claim fails.

Plaintiff's claim that medical staff should have given him stronger medication than Tylenol and Motrin for his pain does not demonstrate that Armor personnel were deliberately indifferent to his medical condition.  See Veloz, 339 F. Supp. 2d at 525; Vail, 2014 WL 4626490, at *14. Other points in the record further confirm why plaintiff does not have a viable deliberate indifference claim based on the purportedly inadequate pain medication he received.  In addition to Tylenol and Motrin, Plaintiff was also eventually prescribed Neurontin, another medication to treat pain.  (Pl. Dep. 126; Pl. 56.1 ¶ 29.)  And, as explained earlier, given plaintiff's abuse of heroin and oxycodone prior to his incarceration, there was ample reason not to prescribe oxycodone for plaintiff's complaints of pain and to instead treat his pain with other medication.  See Wright, 694 F. Supp. 2d at 160.  A reasonable jury could not find, based on the entire record, that stronger pain medication was necessary here.  Plaintiff cannot establish deliberate indifference concerning the pain medication he received.

### ii.  Plaintiff's Keppra Prescription

Plaintiff also raises a meritless claim concerning his Keppra medication, which he was prescribed to treat seizures stemming from his brain injury.

Plaintiff complains that, while at NCCC, he was only given two doses of Keppra a day. (Pl. 56.1 ¶ 30; Pl. Ex. F at NCSD 000248).  Before his incarceration, plaintiff had been prescribed three 500 mg dosages of Keppra per day by his neurologist and asserts that he should have received the same dosage in jail.  (Pl. 56.1 ¶¶ 28–30.)  However, plaintiff's Keppra blood levels were checked at the NCCC.  (Pl. 56.1 ¶ 31.)  Armor progress notes indicate that, with this two dose regimen, his Keppra levels were within normal limits.  (Def. Ex. E (Jan. 20, 2014 progress note); see also Def. Ex. J.)  Plaintiff has no evidence to the contrary.  At his deposition, plaintiff merely testified that he did not know whether this test indicated that the level of Keppra in his blood was

within normal limits.  (Pl. Dep. 134–35.)  Plaintiff's evidence concerning his Keppra prescription is clearly insufficient to survive summary judgment.

It is also notable that plaintiff has not pointed to any evidence in the record that he actually suffered from any seizures while he was housed at the NCCC and was taking only two doses of Keppra per day.  (See also Def. Ex. (Jan. 20, 2014 progress note stating that plaintiff had "no recent seizures).)  This point further supports the adequacy of his Keppra regimen and undermines his claim here.  See Price v. Reilly, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010) (stressing that the "mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean" that the allegedly incorrect medication dosage he received in prison posed an objectively serious health risk and noting that the plaintiff "failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm").

Plaintiff also filed a grievance about Keppra in which he complained that on one particular day—September 10, 2013—he did not receive his Keppra medication.  (Pl. 56.1 ¶ 81; Def. Ex. H.) Medical records indicated that plaintiff did receive his seizure medication twice on September 10. (Defs. Ex. H).  Notably, when asked about this grievance at his deposition, plaintiff did not assert that he received no Keppra on September 10 and instead claimed that his medication was inadequate because he believed he was supposed to receive a third dose.  (Pl. Dep. 133:6-10.)  As explained above, plaintiff's claim that he needed to receive three doses of Keppra per day fails.

Even if plaintiff had offered evidence that he received no doses of Keppra on September 10, that would be insufficient to establish a viable claim.  A failure to provide plaintiff with any Keppra on one particular day would constitute a minor and inconsequential lapse in treatment— that does not establish deliberate indifference.  See Smith, 316 F.3d at 186 (explaining that a

"substantial risk of injury" may be absent where "although an inmate suffers from an admittedly serious medical condition . . . the alleged lapses in treatment are minor and inconsequential").

Plaintiff's claims concerning Keppra are meritless and are dismissed.

### iii.  Neurologist Referral and CAT Scan

As an initial matter, it is "generally understood that 'the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.'"  Laurent v. Edwin, 28 F. Supp. 3d 69, 87 (E.D.N.Y. 2021) (quoting Jacks v. Annucci, No. 18-CV-3291, 2019 WL 3239256, at *4 (S.D.N.Y. July 18, 2019)). See, also e.g., Smalls v. Wright, 807 F. App'x 124, 126 (2d Cir. 2020) ("[Defendants'] decisions not to order an MRI and not to refer [plaintiff] to a specialist constitute matters of medical judgment that do not give rise to [a constitutional] violation."); Scott v. Laux, 07–CV–936, 2008 WL 4371778, at *4 (N.D.N.Y. Sept. 18, 2008) ("disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a § 1983 claim.").

Here, plaintiff cannot establish that his inability to obtain a neurology appointment and CAT scan in the approximately four-month period between January and May 2014 resulted in inadequate medical care and constituted deliberate indifference.  By plaintiff's own account, his neurosurgeon told him that he was supposed to receive a CAT scan every six-to-twelve months. Plaintiff has not even established that he went twelve months without a CAT scan while he was incarcerated at the NCC between August 2013 and May 2014.  Plaintiff admits that he received a CAT scan sometime in 2013 prior to his August 2013 arrest, and that he was released in May 2014. As such, plaintiff has not established that the alleged inadequacy in his medical care was sufficiently serious or that Armor personnel were deliberately indifferent.  "[I]t is the particular

risk of harm faced by the Plaintiff due to a challenged deprivation of care, rather than the severity of [his] underlying medical condition, considered in the abstract, that is relevant" for a claim of deliberate indifference.  Cain, 2007 WL 2193997, at *6.

Additionally, even assuming arguendo that Armor should have ultimately approved a neurology appointment and CAT scan, plaintiff cannot show that his inability to obtain that appointment and CAT scan before his release in May 2014 constituted sufficiently inadequate medical care to violate the Fourteenth or Eighth Amendments.  While lengthy delays in waiting to see a specialist can, in some circumstances, rise to the level of constitutional violation, here, only around four months elapsed between plaintiff's initial request for a neurology consultation and CAT scan, and his release.  Moreover, the Armor progress notes from February 2014 indicate that the neurology visit was delayed because Armor was attempting to obtain plaintiff's medical records from his neurosurgeon.  Such conduct does not establish deliberate indifference.

Defendants are entitled to judgment as a matter of law with respect to plaintiff's deliberate indifference claim concerning the neurology appointment and CAT scan.

### iv.  Bunk on Lower Floor

Plaintiff's 56.1 Statement references a December 4, 2013 grievance in which plaintiff requested a "bottom cell" so that he would not fall down the stairs due to his blindness.  (Pl. 56.1 ¶ 123.)  The record contains no additional evidence about this issue, which does not appear to have been addressed anywhere in plaintiff's deposition testimony.  It does not appear that this claim was even raised in plaintiff's most recent complaint.  In any event, the record for this claim is clearly insufficient to establish a deliberate indifference claim.

40

### 4.  Nutritional Supplements

Plaintiff testified that he repeatedly requested nutritional supplements.  (Pl. Dep. 137.)  The record, however, is devoid of any evidence to support plaintiff's claim that he was denied adequate nutrition.  At his deposition, plaintiff explained that he made these requests because, prior to his incarceration, he was "misusing" his oxycodone and using street drugs, which led to him losing a lot of weight.  (Pl. Dep. 137.)  No doctor, however, told him that he needed nutritional supplements and he never made any complaints about the nutritional quality of the food he received in prison.  (Pl. Dep. 137:3-140:12.)  The record is clearly insufficient to establish that anyone at the NCCC was deliberately indifferent for failing to provide plaintiff with nutritional supplements.  Notably, plaintiff's summary judgment papers do not even identify what his weight was prior to, during, and after his incarceration.  (See Pl. Dep. 136 (plaintiff's testimony that he could not remember how much weight he had lost).)

### 5.  MRSA

Plaintiff argues that as a result of defendants' failure to properly treat plaintiff or address his injuries from the assault he contracted MRSA.  This claim is meritless.

At his deposition, plaintiff could not recall when or how he contracted MRSA.  (Pl. Dep. 140–41.)  Plaintiff, however, did recall that, at some point, he asked to be tested for MRSA.  (Pl. Dep. 141–42.)  Records shows that, on September 19 and September 20, plaintiff submitted sick call slips requesting that he be tested for MRSA.  (Pl. Ex. F.)  The medical staff then tested him and, as a result of his positive test, he was treated with antibiotics and placed in isolation until he recovered.  (Id. 143:23-145:10.)  Armor progress notes indicate that plaintiff was seen about this infection on September 23, 2016 and the lab results came back on September 26, 2014 confirming that plaintiff had MRSA.  (Def. Ex. L; see also Pl. Ex. G.)  Plaintiff's papers never articulate how

this evidence suggests deliberate indifference.  There is simply no evidence that defendants' treatment of plaintiff's infection was deficient in any way.

## G.  Failure to Protect Claim

Plaintiff claims that defendants violated his Eighth Amendment rights by placing him in fear for his life when they assigned him to the same housing area as prisoner Davis, who was awaiting trial for shooting plaintiff in the head.  (Pl. Opp'n. at 20-21.)

### 1.  Background

Following his initial medical evaluation, on August 20, 2013, plaintiff was housed in BA2 for at least two weeks.  (Pl. 56.1 ¶ 7.)   According to plaintiff, he was then placed in E1G housing. Plaintiff testified that he "believe[d]" that Davis—the person who shot him—was also housed in E1G given the nature of their alleged crimes.  (Id. ¶ 103; Pl. Dep. 36:22-37:22, 41:22; 50:14.) When plaintiff was initially admitted to the NCCC on August 20, a notation was placed in his file that he was to have no contact with Davis.  (Pl Ex. B.)

On September 20, 2013, plaintiff was placed in "administrative segregation" because he stated that he felt unsafe in his housing area, but provided no further information.  (Tauster Decl., Administrative Segregation report, ("Defs. Ex. D"), ECF No. 133-8.)   The Administrative Segregation report states that plaintiff "tried to bring drugs into the jail when he was admitted," and notes that he has a friend in protective custody and that he "may be trying to manipulate his housing location by stating he feels unsafe."  (Id.)

Plaintiff testified that, at the time, Davis and other inmates were sending him affidavits to sign to help Davis' defense in his upcoming trial for shooting plaintiff in the head. (Pl. Dep. 40:24-42:3.)  He stated that he became fearful of being housed with Davis after comments were made about him "being a snitch and [Davis] having a shank."  (Id. 44:19-45:10; Pl. 56.1 ¶ 103.)

42

Plaintiff's deposition testimony, however, does not indicate that he ever personally interacted with Davis during his time at the NCCC.  (See Pl. Dep. 44 (plaintiff's testimony about unspecified "note passing" and other inmates making "jokes" about Davis "being there").)

According to his statement during an administrative segregation interview on September 23, 2013, plaintiff did not want to be in administrative segregation and stated that "[he] can live in E1G/17. . . I think the person that shot me is in this housing area.  I'm not saying anything."  (Defs. Ex. D.)  Plaintiff disputes whether he requested to be returned to general housing, but admits that, in this report, he did, in fact, write that he was willing to live in the E1G/17 unit even though he "believed" that Davis was located there.  (Pl. Dep. 49:7-51:14.)  Plaintiff testified that he "was actually in a very bad shape at th[at] time" and that he made the September 23 report for investigative purposes — to find out if Davis was actually located in E1G.  (Pl. Dep. 49:12-51:2.)

Ultimately, a determination was made that plaintiff did not meet the criteria for protective custody and was returned to general housing per his request. (Defs. Ex. D.)  Plaintiff was eventually moved from the E1G unit to a different housing unit.  (Pl. Dep. 51:18–19.)  The record does not identify when this occurred.

In their reply papers, defendants submit additional evidence which indicates that Davis and plaintiff were, in fact, never placed in the same housing area at the same time.  (See Tauster Reply Decl., housing assignments, ("Defs. Reply Ex. B.")  Specifically, defendants submitted a list of Davis' housing assignments from 2011 through 2016 and plaintiff's housing assignments from August 20, 2013 through January 23, 2014.[19]  (Id.)

---

[19] The Court will consider this additional evidence that was submitted with defendants' reply brief.  Notably, Plaintiff did not seek to file a sur-reply to address this additional evidence.  See Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005) (finding that "it is hard for [the non-moving party] to claim unfair prejudice now, because she could have claimed surprise in the district court and sought to file a responsive sur-reply"); Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G., 215 F.3d 219, 227 (2d Cir. 2000) (finding the district court properly considered evidence submitted with plaintiff's reply brief where, inter alia, the opposing party but did not seek leave to file a sur-reply to respond to the new evidence).

### 2. Analysis

Plaintiff's failure to protect claim assumes that Davis was, in fact, placed in the same housing unit as Plaintiff. If, however, Davis was never actually housed with plaintiff, plaintiff's failure to protect claim necessarily fails. As explained below, a reasonable jury could not find, based on the evidence in the record, that Davis was actually housed with plaintiff. Thus, plaintiff's failure to protect claim fails. Plaintiff's claim also fails because he cannot establish <u>Monell</u> liability for the County or Sposato's individual liability for any underlying failure to protect claim.

The housing reports reveal that plaintiff was never actually housed with Davis during his time at the NCCC from August 20, 2013 through January 23, 2014. According to the housing assignment reports, when plaintiff was admitted to the NCCC on August 20, 2013, Davis was housed in the E2E unit, where he remained until October 18, 2013 when he was moved to the B3C unit. (Defs. Reply Ex. B at 3.) On November 22, 2013, Davis was moved to the B4D dorm. (<u>Id.</u>)

By contrast, plaintiff was housed in B2 housing until August 27, 2013 when he was moved to E1G housing where he remained until October 21, 2013. (<u>Id.</u> at 5.) Plaintiff was not placed in E2A housing until October 21, 2013 — three days after Davis was removed from E2E and placed in the B3C unit. (<u>Id.</u>) Thus, the evidence demonstrates that plaintiff was never housed in the same location as Davis during his incarceration in 2013 at the NCCC.

Moreover, even if the evidence submitted with defendants' reply is not considered, the other evidence in the record still fails to establish that plaintiff and Davis were ever housed in the same unit. Plaintiff testified that when he was placed in B2A housing after his initial evaluation, Davis was not there. (Pl. Dep. 36:19-37:2.) According to plaintiff's testimony, approximately two weeks later, he was placed in E1G housing and he "<u>believe[d]</u>" that Davis was also housed in E1G given the "nature of the[ir] crime[s]." (Pl. Dep. 37:12-22, 42:4-22 (emphasis added).)

44

Plaintiff informed staff that "he thinks the person that shot him was in the same housing area, and that he was in fear for his life." (Pl. 56.1 ¶ 116; Defs. Ex. D at 2.) However, plaintiff never definitively stated that Davis was, in fact, in the same housing area as him and has offered no evidence to support this contention. Plaintiff's speculative belief about Davis's purported presence in the same housing unit does not demonstrate that, in fact, he was ever actually housed with Davis. Plaintiff even admitted at his deposition that he submitted his September 23 report about his housing issue for investigative purposes because he was trying to confirm whether or not Davis was located in his housing unit.

As the evidence in the record establishes that plaintiff was not placed in the same housing unit as Davis, plaintiff cannot survive summary judgment on his failure to protect claim.

Finally, even if plaintiff could establish an underlying failure to protect claim based on Davis's housing assignment, plaintiff's failure to protect claims against the County and Sposato— the only defendants before the Court—would fail. There is insufficient evidence in the record to establish <u>Monell</u> liability or Sposato's individual liability on this failure to protect claim. Plaintiff has not pointed to any evidence suggesting that the County had a custom or policy of failing to protect inmates or any evidence that would establish Sposato's personal involvement in this alleged violation. Thus, plaintiff's failure to protect claims fails on this ground as well.

**E.  <u>State Law Claims</u>**

Having dismissed all of plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's various state law claims. See <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 154 F.3d 56, 61 (2d Cir. 1998).

## III.    CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motions for summary judgment and DISMISSES all of plaintiff's federal claims with prejudice.  Further, the Court declines to exercise supplemental jurisdiction over any of plaintiff's state law claims and DISMISSES those state law claims without prejudice.

Although plaintiff paid the filing fee to commence this action, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, should he seek in forma pauperis status for the purpose of an appeal, any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

Dated:  September 29, 2022                    _____/s/ (JMA)_____
Central Islip, New York                               Joan M. Azrack
                                                      United States District Judge